A. L. Greer and Ruth E. Greer, et al. [1] v. Commissioner. Greer v. Commissioner
Docket Nos. 88133, 88134, 88135.
United States Tax Court
T.C. Memo 1962-182; 1962 Tax Ct. Memo LEXIS 128; 21 T.C.M. (CCH) 998; T.C.M. (RIA) 62182; July 30, 1962
Wentworth T. Durant, Esq., Davis Bldg., Dallas, Tex., for the petitioners. Harold D. Rogers, Esq., for the respondent. BLACK SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the years and in the amounts as follows: Docket
No.
Petitioner
Year
Amount
88133
A. L. Greer and Ruth E.
Greer
1955
$ 986.04
1956
7,695.31
1957
22,928.46
88134
William W. Dyer and
Juanita H. Dyer
1956
5,257.43
1957
18,356.32
88135
Fletcher G. Lippitt, Jr.,
and Patricia Ann Lip-
pitt
1957
16,517.43
The issues for decision are: 1. Whether a partnership or joint venture known as Portales Properties sustained losses which are deductible by Greer, Dyer, and Lippitt, for the years 1955, 1956, and *129 1957 as to Greer, 1956 and 1957 as to Dyer, and 1957 as to Lippitt. 2. Whether Greer is entitled to deductions as business expenses for entertainment or promotional expenses for the years 1955, 1956, and 1957, and, if so, the amounts of such deductions. 3. Whether Greer overstated by $8,616.30 the caiptal gain reported on his tax return for the year 1957 and whether Lippitt and Dyer each overstated by $8,616.29 the capital gain reported on their respective returns for the year 1957. 4. Whether Greer, Dyer, and Lippitt, each, are entitled to reduce their gross income in 1957 by the amount of capital gain reported on their returns on the transfer of properties by Portales Properties to Oscura Company, Inc. 5. If petitioners are entitled to reduce the capital gains reported by them, should the amount thereof be offset by the amounts deposited in the bank account of petitioners' partnership or joint venture by the purchaser of ore shipped from the New Mexico properties. Certain other issues raised by the pleadings have been conceded by petitioners. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners A. L. Greer (herein referred *130 to as Greer) and Ruth E. Greer, husband and wife residing in Dallas, Texas, filed joint Federal income tax returns for the taxable years 1955, 1956, and 1957 with the district director of internal revenue at Dallas, Texas. Petitioners William W. Dyer (herein referred to as Dyer) and Juanita H. Dyer, husband and wife residing in Dallas, Texas, filed joint Federal income tax returns for the taxable years 1956 and 1957 with the district director of internal revenue at Dallas, Texas. Petitioners Fletcher G. Lippitt, Jr., (herein referred to as Lippitt) and Patricia Ann Lippitt, husband and wife residing in Dallas, Texas, filed a joint Federal income tax return for the taxable year 1957 with the district director of internal revenue at Dallas, Texas. Greer is a certified public accountant practicing in Dallas, Texas. W. B. Hogg (herein referred to as Hogg) is a consulting geophysicist. Hogg shared a suite of offices with Greer during 1955 and 1956. In 1955 Hogg and Greer were contacted by H. M. Prince, known to Hogg to be a mining engineer. Prince proposed that Hogg and Greer finance a venture to rework the tailings from a mine in Socorro, New Mexico, and thereafter, if successful, *131 to undertake the mining of property called the Portales Properties Company claim. Greer and Hogg, on October 3, 1955, received an assignment of certain leases to lead mining property located in Socorro County, New Mexico from Earl J. Stratton, O. C. Worley, C. M. Worley, and Paul Ridings (hereinafter referred to collectively as the Ridings Group). In the lease agreement dated October 3, 1955, Greer and Hogg agreed to pay $15,500 for the leasehold improvements and certain equipment located on the property. In addition, Hogg and Greer agreed to pay certain royalties to the Ridings Group and to construct a mill with a minimum capacity of 200 tons per day. The amount of $15,500 was the only consideration paid in cash at the time of signing the lease and was placed in escrow in the Portales National Bank at Portales, New Mexico. Strategic Minerals, Inc. (hereinafter referred to as Strategic), was a Delaware corporation in which Greer and Hogg, among others, were stockholders. Hogg owned 63.22 percent of Strategic's stock and Greer owned 5.60 percent of Strategic's stock. Neither Dyer nor Lippitt was a stockholder in Strategic. Strategic paid the $15,500 to the Portales National Bank *132 from a bank loan of $25,000 on a note made by Strategic and endorsed by Hogg and Greer. Hogg and Greer felt that an operating company was needed to operate the mining properties. The stockholders of Strategic, other than Hogg and Greer, did not want Strategic involved in the mining venture. Oscura Company, Inc. (hereinafter referred to as Oscura), a New Mexico corporation, was granted a charter by the State of New Mexico on October 14, 1955. All of its stock was subscribed to and $2,000 paid therefor by Strategic. Oscura was organized to operate the leased lead mine which lease Hogg and Greer had previously acquired from the Ridings Group, and which they held jointly. Oscura was also to construct a mill on the property, which construction Hogg and Greer were obligated to perform under the terms of the lease. Strategic furnished Oscura $7,000 (including the $2,000 subscribed for stock) for mining expense, $8,330 for the purchase of a tractor, and $204.33 for purchase of a check protector. On October 15, 1955, the first meeting of the board of directors of Oscura was held at which all three of the directors were present. The directors were Hogg, Greer, and H. M. Prince. The minutes *133 of this meeting contain the following statement: The President then stated to the Board that W. B. Hogg and A. L. Greer, as a joint venture, had acquired a lead mine in the County of Socorro, State of New Mexico, and that the Corporation had the opportunity to operate and mine said properties wherein it would derive a percentage of the net profits as a result of said operation and it was then suggested that H. M. Prince, a Director herein, be employed by the Corporation to investigate said properties and give his recommendations as to the operation of the same and the feasibility of mining the lead. After considerable discussion, it was RESOLVED, That this Corporation employ H. M. Prince as its Mining Superintendent at a base salary of $100.00 per week, payable weekly and that the said H. M. Prince, be entitled to draw weekly expenses in addition to such base salary in an amount not to exceed $50.00 per week. In addition thereto, the Company will pay gasoline and oil expense attributable to said H. M. Prince's personal automobile, if same be used in behalf the Company. FURTHER RESOLVED, That should this Corporation enter into an agreement wherein it operates said mines in Socorro *134 County on a percentage of the net profits, then and in that event, the said H. M. Prince shall be entitled to receive 5% of said net profits derived by Oscura Company, Inc., said profits, if any, to be paid monthly. Greer and Hogg decided that neither they nor Strategic had the money necessary to finance and carry on a mining operation. They approached Dyer and Lippitt with a view toward interesting them in the business venture. On December 21, 1955, Greer, Dyer, and Lippitt, together with Hogg, entered into a contractual agreement which will be referred to as the four party agreement. This contract provided inter alia: (1) that the parties agree to form a Delaware corporation to be known as United Minerals, Inc. with an authorized capital stock of $20,000 represented by 20,000 shares at par value of $1 per share with a paid-in capital of $1,000 to be contributed equally by each of the parties; (2) that the parties further agree, in behalf of United Minerals, Inc. to the following: (A) To purchase, install and operate a manganese mill in the County of Socorro, State of New Mexico. (B) To acquire from A. L. Greer and Wm. B. Hogg their entire interest in and to their lease, *135 contracts and agreements with Portales Mining Company, et al., pertaining to lead mines in Socorro County, New Mexico, and as a consideration for such acquisition to reimburse the said A. L. Greer and Wm. B. Hogg their actual investment made to date in said properties, reference being here made to the originals of such lease, contracts and agreements. (C) To acquire that.765 25% working interest in the C. R. Taylor Lease, Hopkins County, Texas, now owned by Byrd Oil Corporation for a consideration not to exceed eighty thousand dollars ($80,000.00). (D) To acquire, from time to time, and as the same become available, such other interests in Hopkins County, Texas, composing the "Pickton Unit Number 2," said acquisitions to be upon such terms and conditions as might be mutually agreeable to the parties hereto. (E) To install a gas processing plant on said Pickton Unit Number 2 properties as and when mutually agreeable to the parties hereto. (F) To acquire from A. L. Greer and Wm. B. Hogg, individually, their interests in certain manganese properties in Socorro County, New Mexico, located in Sections 18 and 19, Township 4,000, Range 1 West, N.M.T.H., said properties being known *136 as "Pretty Girl" Claims 1 thru 3, inclusive, as such interest is set out in that assignment of lease from J. L. Williams, et al., to A. L. Greer, dated August 10, 1955, reference to the original of which is hereby made. (3) That the parties agree to negotiate for a loan in the amount of $200,000 immediately upon the formation of the corporation; such moneys to be made available for the general purposes of the corporation and specifically to accomplish the aims and purposes as set out hereinabove in paragraph 2 and it is mutually agreed that all the parties will endorse any note executed by the corporation and F. G. Lippitt, Jr. agrees to secure such loan by placing collateral owned by him individually until such time as the corporation acquires properties which should and could be used to replace the collateral contributed by Lippitt. On December 21, 1955, United Minerals, Inc. (hereinafter referred to as United) was organized as a Delaware corporation by Greer, Dyer, Lippitt, and Hogg. Paid-in capital of the corporation was $1,000 and the stock was subscribed to and distributed equally among Greer, Dyer, Lippitt, and Hogg. Hogg was president and Greer was secretary-treasurer. *137 On December 22, 1955, United purchased all of the stock of Oscura from Strategic for $31,034.33 which was the total amount previously furnished by Strategic for payment for the leasehold improvements on the mining property and for equipment purchased and mining expenses of Oscura. Thereafter, during all periods relevant hereto, Oscura was a wholly owned subsidiary of United. Hogg was president of Oscura and Greer held the office of secretary-treasurer. Pursuant to the four-party agreement dated December 21, 1955, United engaged in the following projects: (1) acquired a working interest in the C. R. Taylor leases, Hopkins County, Texas from the Byrd Oil Corporation for $80,000 which was described in paragraph (2)(c) of the four-party agreement, and (2) immediately borrowed $140,000 from the Mercantile National Bank, Dallas, Texas on December 21, 1955, pursuant to paragraph (3) of the four-party agreement. Oscura installed and operated a lead mill in Socorro County, New Mexico. At some indeterminate time prior to the signing of the four-party agreement, Greer, Dyer, Lippitt, and Hogg met in Greer's office to discuss the formation of United. After one such meeting, Greer recorded *138 the understanding of the parties in a longhand memorandum. This memorandum provided, inter alia: F. G. Lippitt, Jr., Wm. W. Dyer, Wm. B. Hogg and A. L. Greer mutually agree as follows: * * *
2. To negotiate loan or loans as required by said corporation [United] to accomplish the following contemplated business ventures and when the parties may mutually agree to commence such ventures: * * *
(b) Acquire investment made to date in Oscura mountain lead properties by W. B. Hogg, A. L. Greer and Strategic Minerals, Inc. and go forward with the operations of said properties as contracted for by A. L. Greer and Wm. B. Hogg. In consideration W. B. Hogg and A. L. Greer agree to transfer 1/2 their interest in said Lead lease owned by them to Wm. W. Dyer and F. G. Lippitt, Jr., so that their-after [thereafter] said sub-lease will be owned 25% by each of the four parties. On May 2, 1956, Greer and Hogg assigned one-half of their undivided interest in and to the lease located in Socorro County, New Mexico, and certain other claims to Lippitt and Dyer as a result of which Hogg, Greer, Dyer, and Lippitt thereafter each owned one-quarter interest in the leasehold properties. *139 Shortly after the assignment of the lease to Hogg and Greer, a dispute arose between the Ridings Group and Ora W. Blanchard as to their respective interests in the mining properties. Hogg and Greer, on February 21, 1956, entered into an agreement with the Ridings Group to exclude the controverted interest from their lease agreement and to deal separately with Ora W. Blanchard. On April 25, 1956, Ora W. Blanchard signed a lease agreement with Hogg and Greer. United Minerals, Inc. on December 17, 1955, opened a commercial checking account at the Mercantile National Bank, Dallas, Texas, which reflected the following total deposits and check disbursements for the years indicated: Check Dis-
Year
Deposits
bursements
1955
$141,000.00
$ 34,160.83
1956
369,534.19
476,312.42
1957
326,275.77
326,335.34
Totals
$836,809.96
$836,808.59
The loan account records of the Mercantile National Bank, Dallas, Texas, reflect the following loans made to United as of the dates indicated: Date
Amount
12/21/55
$140,000
1/18/56
50,000
1/27/56
10,000
1/31/56
20,000
2/20/56
10,000
3/ 8/56
20,000
Totals
$250,000
The loan account records of *140 the Reserve Life Insurance Company, Dallas, Texas, reflect the following loans to United and repayments thereof as of the dates indicated: Date of Loan
Amount
12/26/56
$217,000
Principal
Date of
Payments
Payment
Paid By
$ 4,000
4/16/57
Oscura, Co., Inc.
4,000
5/15/57
United
4,000
5/28/57
United
4,000
7/10/57
United
9,000
7/30/57
Portales Properties from
Proceeds of Loan at Pres-
ton State Bank
3,000
9/30/57
United
4,000
10/29/57
United
4,000
12/ 3/57
United
181,000
1/20/58
Sale of Tammaney Par-
ish (La. Bonds of F. G.
Lippitt, Jr.)
Oscura, on October 11, 1955, opened a commercial checking account at the First National Bank, Dallas, Texas, which reflected the following total deposits and check disbursements: Check Dis-
Year
Deposits
bursements
1955
$ 12,000.00
$ 6,608.51
1956
248,999.03
215,181.29
1957
19,243.56
58,332.18
Totals
$280,242.59
$280,121.98
The loan account records of the First National Bank, Dallas, Texas reflect the following loans made to Oscura on the dates indicated: Date of
Date
Loan
Amount
Paid By
Paid
9/12/56
$20,000
Oscura
12/31/56
11/28/56
10,000
Oscura
12/31/56
2/22/57
4,000
3/19/57
2,000
4/15/57
10,000
Totals
$46,000
*141 When sales of lead began to be made, the joint venture or partnership adopted the name Portales Properties as its assumed name and an assumed name certificate was filed in December 1956 in the office of the County Clerk at El Paso, Texas. A bank account with the El Paso National Bank was opened in the name of Portales Properties in August 1956. Portales Properties also had three bank accounts at the Preston State Bank at Dallas, Texas. Partnership returns were filed for Portales Properties for the taxable years 1956 and 1957. On December 17, 1956, Hogg withdrew from the business enterprises in which he had been associated with Greer, Dyer, and Lippitt. By contract Hogg transferred his rights in the leased lead mine, his stock in United, and certain other property not here relevant to Greer, Dyer, and Lippitt. In return therefor, Greer, Dyer, and Lippitt agreed to hold Hogg harmless from any claim occasioned by the acquisition, ownership, or operation of the properties and companies in which he had an interest. At the time United was incorporated it was the intention of Greer as one of the original incorporators and stockholders to conform subsequently to all Securities and *142 Exchange Commission requirements and offer the stock to the general public. One of the purposes of the parties in creating United and in having United acquire the stock of Oscura was to secure protection from individual liability in case of damage suits. Another purpose was the possible registration of a public issue of United's stock with the Securities and Exchange Commission and the subsequent sale of such stock to the general public. This was never done. No written partnership agreement was ever in existence among Greer, Dyer, Lippitt, and Hogg; nor was there a written partnership agreement later among Greer, Dyer, and Lippitt. No written operating agreement existed among Greer, Dyer and Lippitt, and Oscura; nor did a written operating agreement exist among Greer, Dyer and Lippitt, and United; nor did a written operating agreement exist between United and Oscura. The general procedure used to purchase materials for equipping the mill and mine and for the construction of the mill in Socorro County, New Mexico was for United to order the materials and request the seller to ship such materials to Oscura. United advanced to Oscura most of the funds expended by Oscura during *143 1956 and 1957 and showed such amounts on its books as due from Oscura. Oscura's records initially reflected such amounts as due to United. There was no holding out to third parties that Portales Properties or any of the individuals comprising Portales Properties was purchasing materials for use in construction of the mill or for the equipment for the mine. All of the moneys expended to pay for all the operating expenses claimed as deductions of a jointly owned lead mine on the 1955 individual return of Greer in the amount of $8,183.27 was disbursed from the bank account of Oscura. Beginning in late 1955 and continuing up to and including December 31, 1957, all disbursements for expenditures for the construction of the mill and operation of the mill and mine in Socorro County, New Mexico were made by Oscura. Such amounts were disbursed out of Oscura's bank accounts or by United on behalf of Oscura and originally recorded in the cash disbursement journal of Oscura. [2]
*144 Oscura's first fiscal year ended September 30, 1956. United's fiscal year ended November 30. Portales Properties' year was the calendar year. By general journal entry dated September 30, 1956, all of the operating expenses and operating assets charged on Oscura's books as having been originally incurred and paid by Oscura were transferred on Oscura's records to Portales Properties. This was the first general journal entry showing a transfer of such assets and expenses to Portales Properties. There was no written assignment, bill of sale, or any other document underlying the general journal entries on Oscura's books dated September 30, 1956. The first general journal entry on the books of Portales Properties regarding the transfer of operating assets and expenses from Oscura was dated December 31, 1956. There was no written assignment, bill of sale, or any other document underlying the general journal entry dated December 31, 1956, on the books of Portales Properties. After the first general journal entry dated December 31, 1956, on the books of Portales Properties showing the transfer of all operating assets and expenses of Oscura up to that date, similar general journal *145 entries were made either monthly or at longer intervals on the books of Portales Properties with respect to the transfer of operating assets and expenses which had been incurred and paid by or on behalf of Oscura and recorded on Oscura's books. All of the employees, including the supervisors, at the mill and mine in Socorro County, New Mexico, were employed by Oscura. Social Security tax returns were filed by Oscura covering such employees. The employees were paid by checks on the account of Oscura and were treated for withholding tax purposes as employees of Oscura. The total cash expenditures and payables incurred in connection with the mining properties in Socorro County, New Mexico, operated by Oscura for mill construction and mine development for the years 1955, 1956, and the period January 1 to July 31, 1957, were as follows: Jan. 1 to July
1955
1956
31, 1957
Total
Cash paid out
$33,627.57
$324,913.60
$ 94,643.50
$453,184.67
Accruals, accounts and notes payable assumed
373.46
79,962.28
55,251.63
135,587.37
Totals
$34,001.03
$404,875.88
$149,895.13
$588,772.04
Mill construction and equipment
$24,034.33
$332,125.07
($ 5,295.06)
$350,864.34
Mining expense and other assets
9,966.70
72,750.81
155,190.19
237,907.70
Totals
$34,001.03
$404,875.88
$149,895.13
$588,772.04
*146 In the summer of 1957, Greer, Dyer, and Lippitt employed an attorney for the purpose of securing advice as to whether they or their controlled corporations could obtain a loan from the Small Business Administration. This attorney advised them that in order to present the strongest possible application they should consolidate several of the assets that were in the hands of the interested parties into one corporation for the purpose of making a loan application in the corporate name. All of the operating assets and operating expenses which had been previously transferred by general journal entry to Portales Properties were transferred to Oscura by general journal entries on the books of Oscura and Portales Properties on July 31, 1957. There was no written assignment, bill of sale or any other document in existence on July 31, 1957, underlying this transfer by journal entry. The minutes of a meeting of the board of directors of Oscura held on October 5, 1957 state that the board of directors has authorized the president of Oscura to acquire the mining leases, mining claims, mine equipment, and crushing and concentrating mill of Portales Properties located in Socorro County by assuming *147 a debt of $588,159.51 owed by Portales Properties to United. On October 7, 1957, Greer, Dyer and Lippitt, individually, and Lippitt on behalf of Oscura agreed by contract to the transfer of the mining leases and other properties to Oscura in return for the assumption by Oscura of the debts owed by Portales Properties to United. Portales Properties on its Federal partnership return of income for its fiscal year 1957 reported a gain from the sale of assets to Oscura of $257,295.80 arrived at as follows: Assets sold less depreciation
$331,476.24
Sales price, liabilities assumed
331,476.24
Gain in sale of assets
0
Mineral claims sold
0
Sales price, liabilities assumed
257,295.80
Gain on sale of mineral claims
$257,295.80
By letter dated July 25, 1956, a representative of the American Smelting and Refining Co. (hereinafter referred to as American) notified Greer that settlement sheets for lead concentrate shipments would be prepared based on his instructions. American required Greer to furnish it with copies of leases showing his title and authority to extract and sell minerals. After receipt of the copies of these leases from Greer, American set up a purchase *148 schedule effective February 26, 1956, in the name of A. L. Greer and associates. Deliveries of lead by Oscura to American began on August 22, 1956, and each such delivery bore this schedule number. The settlement sheets were made either in the name of Hogg and Greer, Hogg and Greer-Oscura Mining Co., or Oscura Mining Co. (Hogg and Greer). The first two checks drawn by American in 1956 in payment for ore were made payable to Hogg and Greer, one check was made payable to Oscura, and the others to the El Paso National Bank for the account of Oscura Mining Co. (Greer), and all of these checks were deposited in the account of Portales Properties at the El Paso National Bank. The checks made to the bank were deposited to the account of Portales Properties pursuant to Greer's instructions. Between January 1, 1957, and July 31, 1957, 24 checks drawn by American in payment for the lead ore shipped by Oscura to it were made payable to the El Paso National Bank for the account of Oscura Mining Co. (Portales Properties). Some of the checks were endorsed in the name of Oscura Mining Co.; some were endorsed Oscura Mining Co., and then a line was drawn through the words "Oscura Mining Co." and *149 the words "Portales Properties" were written below and the remainder of those checks were endorsed Portales Properties. The checks drawn by American to the order of El Paso National Bank for the account of Oscura (Portales Properties) from January 1, 1957, through July 31, 1957, were all deposited to the bank account of Portales Properties at the El Paso National Bank and totaled $18,898.83. On its Federal income tax return for its fiscal year ended September 30, 1956, Oscura showed no income and no deductions. The balance sheet on the return showed as of the end of the year assets of $135,079.60 consisting of cash of $73.43 and notes and accounts receivable, "Trustee Account," of $135,006.17. The balance showed capital stock of $2,000 and liabilities of accounts payable of $108,550, bonds, notes and mortgages payable of $20,000, and accrued payroll taxes of $4,529.60. It showed no paid-in or capital surplus. On its Federal income tax return for its fiscal year ended September 30, 1957, Oscura reported a net loss of $23,665.18. The balance sheet on the return showed capital stock of $2,000 and no paidin or capital surplus. United on its Federal income tax return for the fiscal *150 year ended November 30, 1956, reported a net loss of $13,075.80 and on the balance sheet of this return showed a deficit in earned surplus and undivided profits in the amount of $12,579.73, capital stock of $1,000 and no paid-in or capital surplus. On its Federal income tax return for the fiscal year ended November 30, 1957, United reported a net loss before operating loss deduction of $23,548.91 and on the balance sheet of that return showed a deficit in earned surplus and undivided profit of $38,955.27, capital stock of $1,000 and no paid-in or capital surplus. Deposits were made in Oscura's bank account in 1956 and the period from January 1 to July 31, 1957, by Lippitt in the amount of $9,087.53, by Greer in the amount of $4,200, by Dyer in the amount of $166.41, and by Portales Properties in the amount of $10,690. Deposits were made in United's bank account during the year 1956 and the period from January 1 to July 31, 1957, by Lippitt (exclusive of items designated as "F. G. Lippitt, Estate," "F. G. Lippitt, Jr. - Oil," "Note - F. G. Lippitt, Jr.") in the amount of $10,302.22, by Greer in the amount of $1,450, and by Portales Properties in the amount of $16,060.48, the first *151 deposit by Portales Properties being made on October 12, 1956. In addition to the above deposits there were deposits during the same period in United's accounts entitled, "Advance - W. W. Dyer" in the total amount of $4,350, "Note - F. G. Lippitt, Jr." in the total amount of $120,000, "Lippitt, Dyer and Greer" in the amount of $4,160.41," "F. G. Lippitt and W. W. Dyer - Oil" in the amount of $613.32, "F. G. Lippitt, Estate" in the amount of $580.33, "F. G. Lippitt, Jr. - Oil" in the amount of $1,928.12, and "F. G. Lippitt Estate - Oil" in the amount of $1,928.12. The amount of $4,160.41 deposited to United's account and in its records designated under the name, "Lippitt, Dyer and Greer" came from the proceeds of a loan to the three individuals and the amount was set upon the records of United as an advance by Lippitt, Dyer, and Greer. The amounts of deposits in United's bank accounts shown as "Note - F. G. Lippitt, Jr." were considered as advances to United by Lippitt, and United's records showed these amounts as accounts payable to Lippitt. On September 5, 1956, a check in the amount of $17,000 drawn by United was deposited in the bank account of Portales Properties. During the *152 years 1955, 1956, and 1957 Greer was engaged in a public accounting practice operating a firm as a sole proprietorship. For these years he reported on his income tax returns as fees collected from his accounting practice the amounts of $55,732.22, $92,684.14, and $78,673.69, respectively. During these years in connection with his business he paid in cash, luncheon and coffee checks of attorneys and other taxmen with whom he was working and other items connected with meeting the public. Greer kept no memoranda of the specific amounts spent and precisely for what the amounts were spent. He estimated such out-of-pocket expenditures from a percentage of his cash withdrawals from his bank account by deducting from the amount of such withdrawals the expenditures for items he considered to be personal expenses. He recorded the amounts he considered to be business expenses in his records as chargeable to his business. For the years 1955, 1956, and 1957 Greer on his tax returns deducted under the designation of tax services and other expenses the respective amounts of $3,673.25, $3,504.32, and $2,800.51. Respondent disallowed the amounts of the deduction which represented claimed expenditures *153 for items other than tax services, such disallowed portion being the amounts claimed by petitioner to be cash expenditures for entertainment and promotional expenses. For the years 1955, 1956, and 1957 such claimed deductions disallowed by respondent were in the respective amounts of $1,400.69, $1,168 and $512 and the reason given by respondent in the notice of deficiency for such disallowance in each year was that Greer had failed to substantiate the claimed deduction. Greer in his 1955 income tax return claimed a deduction in the amount of $2,045.81 for expenses of a joint venture with Dyer, Lippitt, and Hogg. Respondent disallowed this claimed deduction with the explanation that "It is determined that the claimed deduction for expense of the joint venture is expense of Oscura Company, Incorporated." Dyer and Greer claimed on their 1956 income tax returns a distributive partnership loss from Portales Properties in the respective amounts of $23,117.47 and $23,117.48. Respondent disallowed each claimed distributive partnership loss from Portales Properties with the following explanatory paragraph, identical in material respects, in his respective notices of deficiency to Dyer *154 and Greer: From an examination of the books and records of Portales Properties, a partnership, for the taxable year ended December 31, 1956, it is determined that your distributable share of the ordinary income, or loss, from such partnership, is none instead of a loss of $23,117.48 as claimed on your return. The claimed loss from this partnership is disallowed. See Exhibit A. Greer, Dyer, and Lippitt, each, in their 1957 Federal income tax returns claimed as distributive partnership losses from Portales Properties in the respective amounts of $51,488.62, $51,488.61 and $51,488.62. Respondent disallowed each of the claimed distributive partnership losses from Portales Properties with the following explanatory paragraph, identical in material respects, in each of the individual notices of deficiency: From an examination of the books and records of Portales Properties, a partnership, for the taxable year ended December 31, 1957, it is determined that your distributable share of the ordinary net income, or loss, of such partnership is none instead of a loss of $51,488.62 as claimed on your return. The claimed loss from Portales Properties, a partnership, is disallowed. See Exhibit *155 B. On both exhibits A and B attached to each notice of deficiency respondent showed the ordinary income and loss of Portales Properties, a partnership, to be zero with the explanation: It is determined that the income and expenses resulting in the claimed loss are income and expenses of Oscura Company, Incorporated. Greer, Dyer, and Lippitt, each, reported in his Federal income tax return for 1957, a capital gain in the respective amounts of $85,765.27, $85,765.26 and $85,765.27 as the gain on the transfer of properties to Oscura. As an alternative contention raised by amendment to each petition, Greer, Dyer, and Lippitt, each, contend that if respondent is correct in his disallowance of the losses claimed by each as his distributive portion of the loss of the partnership, Portales Properties, respondent erred in failing to reduce his gross income for 1957 by excluding his gain reported on the sale of assets to Oscura. In his answer to each of the identical amendments to the petitions herein, respondent alleged as an affirmative defense to petitioners' alternative contention that the moneys paid by American to Oscura in 1957 by checks to the order of El Paso National Bank *156 for the account of Oscura (Portales Properties) which were deposited in the bank account of petitioners' joint venture, represented in the absence of earnings and profits, a return of capital, and that these withdrawals must be treated as gain from the sale or exchange of property to the extent that such amount exceeded the adjusted basis of petitioners' stock in United. In his petition to this Court, Greer alleged that the capital gain as reported on his 1957 income tax return from the transfer of property by Portales Properties to Oscura was overstated in the amount of $8,616.30 and Dyer and Lippitt each alleged that such capital gain as reported on their income tax returns was overstated in the amount of $8,616.29 for the taxable year 1957. Opinion Petitioners contend that they properly deducted losses from a joint venture or partnership on their individual returns for the years 1955, 1956, and 1957 as to Greer, 1956 and 1957 as to Dyer, and 1957 as to Lippitt. They contend that Oscura was merely their agent in operating the mining properties and that amounts paid by Oscura were actually paid by them as joint venturers or partners. Petitioners point out that they, as individuals, *157 retained title to the mining leases and never conveyed title to either United or Oscura. They contend that the statement in the four-party agreement that United would acquire these leases was inadvertent and that the parties intended to agree that Hogg and Greer would assign a one-hall interest in the leases to Dyer and Lippitt so that each of the individuals would become a 25 percent owner of such leases. Respondent takes issue with these contentions of petitioners and argues that the provision in the four-party agreement caused United to become the equitable owner of the leases and therefore the expenditures made by Oscura and United are expenditures of the two corporations and not of the partnership. While much of the argument of each party is devoted to the factual question of whether the petitioners were obligated to transfer the leases to United, in our view it is unnecessary to decide this question since even if we assume that title to the mining leases not only did remain in the individuals as joint venturers or partners but at all times prior to July 31, 1957 was intended so to remain, and that the statement in the four-party agreement with respect to United acquiring *158 these leases was a mistake to be given no effect, petitioners have failed to establish that the joint venture or partnership did, in fact, sustain losses in each of the years here involved which are distributable to the various partners or joint venturers. Respondent's determination was simply that the income and expenses resulting in the losses claimed by the individuals are income and expenses of Oscura and petitioners have the burden of establishing that the expenditures which caused the losses from the mining operation were expenditures of the partnership or joint venture paid or incurred in the taxable years involved. The evidence is clear that neither the individuals nor the joint venture or partnership made any substantial payments for any of the expenditures here involved, all payments being made either by United or Oscura. [3] The evidence does show that the individuals endorsed the corporate notes of United by which funds were borrowed by United and that Lippitt put up property owned by him personally to secure certain of these loans, but it is clear that at least the greater portion of the loans was made by United as the obligor with the individuals merely guarantors thereof. *159 There is some evidence tending to show that individual loans were made to Lippitt by a third party and the evidence shows deposits in United's bank accounts designated in each instance "Note - F. G. Lippitt, Jr.," totaling $120,000 for the years 1956 and 1957. These amounts were considered by United as loans to it by Lippitt. The evidence is not clear that the moneys so advanced by Lippitt to United were turned over to Oscura for use in financing the operation by Oscura of the mining leases here involved. The evidence shows that United had business operations other than those conducted by its subsidiary, Oscura. United's total disbursements from its bank accounts in the years here involved were $836,808.59, whereas the total expenditures by Oscura here in issue were only $588,772.04. *160 The evidence further fails to show whether the joint venture or partnership reported its income on the cash or an accrual basis. If it reported on the cash basis, it would follow that since no expenses were actually paid by the partnership or joint venture, the amounts thereof are not deductible by it unless Oscura is to be considered its agent and the payments by Oscura are to be considered the equivalent of payments by the partnership or joint venture. Petitioners' contentions are based entirely upon the existence of such an agency relationship. Petitioners apparently assume that if they can establish that they owned the leases and had not contracted to transfer them to United, they have established that the expenditures made by United and Oscura were expenses of the partnership or joint venture and the corporations made such expenditures as their agents. In our view, this conclusion does not follow. Retention of title to property does not necessarily determine the taxability of income resulting from the use of such property, Cf. Bartell Hotel Co., 32 T.C. 311 (1959), or *161 expenses incurred in connection with its use. It is not an uncommon practice for an owner or lessee of mineral properties to have those properties operated by an independent contractor under a contractual arrangement, even though ownership of the mineral properties or the lease is retained by the party who contracts for another to extract the minerals. Such agreements have given rise to litigation involving rights to depletion deductions by the owner or the operator, which question has been resolved in each such case on the basis of the provisions of the contract involved. See Burton-Sutton Oil Co. v. Commissioner, 328 U.S. 25 (1946) and Usibelli v. Commissioner, 229 F. 2d 539, 542-543 (C.A. 9, 1955) affirming a Memorandum Opinion of this Court, in which reference is made to the practice of contracting out operations of mineral properties. See also United States v. Stallard, 273 F. 2d 847, 849 (C.A. 4, 1959), in which specific reference is made to the operator's carrying workmen's compensation and public liability insurance and being considered an independent contractor solely liable for damages for injury to person or property in the performance *162 of the contract, and Matagorda Shell Co., 29 T.C. 1060 (1958). In the instant case the partnership or joint venture had no written agreement with Oscura and the evidence fails to show with any precision what the oral arrangement with Oscura was considered to be by the parties. [4] Petitioners have shown that the amounts expended by Oscura in constructing the mill and operating the mine, most of which funds had been advanced by United to Oscura and carried on Oscura's books as due United, were transferred by general journal entry to the books of the partnership or joint venture. These entries were made by an accountant employed by Greer on the assumption that the relationship between Portales Properties and Oscura was that of principal and agent, and, therefore, are no more proof of the fact of such a relationship than the petitioners' tax returns which were also filed on such basis, the deductions so claimed therein having been disallowed by respondent. The evidence shows no transfer of title to the assets purchased to the partnership. There is no showing of the arrangement as to ownership of the mill constructed at the leased mine. Petitioners explain United's function *163 as that of financing but give no explanation as to why it did not charge the funds directly to the partnership or joint venture if, in fact, the partnership or joint venture was the principal and Oscura its agent. If the reason was to have Oscura be responsible in case some liability was incurred in the mine operation it would indicate that Oscura was not an agent. The minutes of Oscura's first meeting referred to its operating the mine for a percentage of net profits without reference to who would furnish the operating funds and with no reference to operating as an agent of the partnership or joint venture. Though not worded in such terms, petitioners are in effect, in the instant case, asking that the corporate entity of Oscura be overlooked and the arrangement be considered as if the partnership, itself, operated the properties. Petitioners here organized United and had it acquire the stock of Oscura which previously had been organized by Strategic for reasons not fully shown in the record but with some thought of having a limitation on the personal liability of Hogg, Greer, Dyer and Lippitt. *164 These corporations borrowed money and made disbursements from their bank accounts, Oscura hired employees who engaged in mining operations and United engaged in activities other than those connected with financing Oscura. The evidence indicates that the organization of United and Oscura was for the purpose of business activity and that these corporations, after their organization, engaged in the carrying on of business. Under these circumstances the corporations, for tax purposes, are separate entities from their incorporators. Moline Properties, Inc., 319 U.S. 436, 439 (1943); Jackson v. Commissioner, 233 F. 2d 289 (C.A. 2, 1956), affirming 24 T.C. 1 (1955); G. Loutrell Timanus, 32 T.C. 631, 644-645 (1959) affd. 278 F. 2d 297 (C.A. 4, 1960). The corporate entity of a corporation may be recognized and the activity in which it is engaged be that of an agent for its owners if in fact its operation is that of an agent and the agreement between the two contains "the usual instances of an agency relationship." National Carbide Corp. v. Commissioner, 336 U.S. 422 (1949), *165 Cf. Moline Properties, Inc., supra. The contract involved in National Carbide Corp. v. Commissioner, supra, provided that the subsidiary corporation was employed as agent to manage and operate plants of its parent corporation and as agents to sell the output of the plants but the Supreme Court concluded that despite these words in the contract the relationship between the subsidiary and parent was not that of agent and principal stating that the parent, "for sufficient reasons of its own, wished to avoid the burdens of principalship." The evidence in the instant case indicates that Greer, Dyer and Lippitt wished to limit their personal liability by having Oscura operate the mines. Petitioners did not explain how they intended their personal liability to be limited if Oscura were operating as agent of the partnership or joint venture. The meager evidence available with respect to the relationship between the partnership or joint venture and Oscura indicates that the persons employed to work in the mining operations considered themselves employees of Oscura and did not know about the existence of the partnership or joint venture. The evidence fails to show *166 that the true relationship between the partnership or joint venture and Oscura was that of principal and agent and petitioners have, therefore, failed to carry their burden of proof of showing that the Commissioner erred in determining that the expenses which resulted in the losses deducted by them were those of Oscura. Respondent concedes that if we sustain his disallowance of claimed distributive losses from Portales Properties by Greer, Dyer, and Lippitt, the capital gain in the amount of $85,765.27 reported by each of them on his 1957 income tax return should be eliminated except to the extent of $6,049.61. Respondent points out that checks drawn by American to the order of El Paso National Bank for the account of Oscura Co. (Portales Properties) in the total amount of $18,898.83 were deposited in the account of Portales Properties in 1957. Respondent contends that the deposit of Oscura's funds by the individuals in their joint venture bank account constitutes a distribution of corporate funds to United's shareholders and computes the $6,049.61 by dividing the amount of these deposits by three and subtracting from the $6,299.61 so derived the amount of $250 which respondent states *167 represents the adjusted basis of United's stock to each Greer, Dyer and Lippitt. Respondent treats the $6,299.61 as a distribution which is not a dividend and thus a capital gain to the extent that it exceeds the adjusted basis of each petitioner in United's stock. The income tax returns of both Oscura and United show no earnings and profits for either the year 1956 or 1957 and at the end of the fiscal year of each in 1957 show a deficit in earned surplus and undivided profits. The returns of neither corporation show for either its fiscal year 1956 or 1957 any paid-in or capital surplus. However, the evidence does show deposits by Greer, Dyer and Lippitt as individuals and by Portales Properties to the bank accounts of both Oscura and United for the years 1956 and 1957. [5] While the evidence is not as clear as might be desired, by preponderance it shows that the investment of the individuals and partnership or joint venture in these two corporations exceeded $18,898.83 and under our holding disallowing all claimed deductions by the individuals for expenditures by the corporation and considering the fact that Oscura is a wholly owned subsidiary of United, it logically follows that these *168 deposits to the extent that they are not loans or advances, should be treated as capital contributions. For the purposes here involved it is unnecessary to determine the exact amount of the capital contribution by each Dyer, Lippitt and Greer since considering the deposits by Portales Properties to Oscura's bank account in the amount of $10,690 plus the $9,000 loan of United paid by Portales Properties on July 30, 1957, to apply one-third to each of the individuals, such capital contributions exceeded $6,049.61 each. The circumstances of these deposits and this loan repayment indicated that the amounts were more in the nature of capital contributions than advances. Therefore, no gain as contended by respondent resulted to either Greer, Dyer or Lippitt from the deposits by American to the account of Portales Properties even if such deposits were to be considered distributions to them by either United or Oscura as respondent contends. We hold that the long-term capital gain reported in each petitioner's 1957 tax return as a gain on the transfer of property to Oscura should be eliminated in the full amount of $85,765.27. This holding *169 renders moot petitioners' contention that the capital gain on the transfer of assets and liabilities by Portales to Oscura was overstated. The final issue involves only Greer and is whether respondent properly disallowed certain claimed deductions for business expenses in each of the years 1955, 1956 and 1957. Greer is a certified public accountant and in the years here involved conducted an active practice in that profession. He testified in general terms as to the expenses disallowed by respondent characterizing them as entertainment expenses in the nature of the cost of luncheon and coffee checks. The amounts of $1,400.69, $1,168, and $512 for the years 1955, 1956, and 1957, respectively, which were disallowed by respondent were the total amounts claimed by Greer as entertainment and promotional expenses. Certainly a certified public accountant with a practice that produced fees in the amounts reported by Greer incurred some entertainment and promotional expenses. Greer presented no records, memoranda or other documentary evidence to demonstrate the nature and amount of the expenses claimed and the proximate relationship between such expenses and his business. He testified that *170 these expenses were estimated but did not explain why the amounts claimed as deductions in 1955 and 1956 were almost three times and double, respectively, the amount claimed as a deduction in 1957. His method of estimating the portion of the cash which he withdrew from his bank account that was used for business entertaining and promotion by subtracting from his cash withdrawals, amounts he estimated that he expended for personal purposes, would tend to overstate the business expenditures as any items which he overlooked would remain in the amount allocated to business. Since we are convinced that some portion of the claimed expenditures is properly deductible as business expenses under section 162 of the Internal Revenue Code of 1954, bearing heavily against Greer whose inexactitude is of his own making, we hold on the basis of the entire record that Greer is entitled to deduct the amount of $300 in each of the years 1955, 1956 and 1957 as an ordinary and necessary business expense for entertainment and promotion. Decision will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: William W. Dyer and Juanita H. Dyer, Docket No. 88134, and Fletcher G. Lippitt, Jr. and Patricia Ann Lippitt, Docket No. 88135.↩
2. The parties orally stipulated at the trial that substantially all of these disbursements were made from Oscura's bank account. However, the parties also stipulated that total disbursements from Oscura's account for the period covered were $280,121.98 and the total of expenditures for mill construction and operation for this period was $588,772.04. We therefore assume that the parties considered disbursements from United's bank accounts on behalf of Oscura to be equivalent to disbursements from Oscura's account.↩
3. The parties orally stipulated at the trial that all disbursements for the expenditures here in issue were from Oscura's bank account. This apparently also included disbursements from United's account on behalf of Oscura. There is no evidence of any payments by Greer, Dyer and Lippitt or the partnership to Oscura except that the evidence shows total deposits during 1956 and 1957 by these individuals and Portales Properties to Oscura's bank account in the amount of $24,143.94 and to United's in the amount of $41,373, exclusive of notes of Lippitt. There is no evidence to show that these deposits had any relationship to the expenses here involved. The amount of the deposits to Oscura's account is approximately the total deposits to Portales Properties' account by American less royalties paid. Whether there is any connection between these amounts other than coincidence is not shown by the evidence. These deposits to Oscura's account may have been capital contributions. Of the $41,373 deposited by the individuals (including amounts marked advances, oil, and Lippitt Estate) and Portales Properties to United's account, $16,060.48 was deposited by Portales Properties, most of these deposits being in even amounts ranging from $100 to $1,600. The first such deposit was on October 12, 1956 about 1 month after a deposit of $17,000 shown as coming from United appears in Portales Properties' bank deposits. It might be inferred from these facts that the deposits by Portales Properties to United's account were in repayment of a loan by United to Portales Properties of $17,000. Certainly it cannot be inferred without proof that the deposits represented payment of any of the expenditures here in issue. The deposits by the individuals to United's account are in no way shown to be connected with the expenditures herein issue. These deposits may have been connected with other business of United or may have been capital contributions by the stockholders. The evidence does not disclose any explanation of the purpose of these deposits, except that the amount of $4,160.41 was used to pay interest on a large loan of United which in this instance shows that the amount was not advanced to Oscura. One $9,000 loan to United was repaid by Portales Properties on July 30, 1957 from the proceeds of a loan to it and this amount was stated by Greer to be in repayment of a loan, the proceeds of which were advanced by United to Oscura. From the date of this payment the inference would be that it was connected with the transfer of the leases to Oscura on the books of Portales and Oscura. Payments during 1956 were made by Portales Properties of certain royalties totaling $1,536.66, interest of $225, mine rent of $50 and miscellaneous of $19.02. The royalties are not shown by the evidence to be in any way connected with the expenditures here in issue. There are certain exhibits which indicate from inference of figures in the same amounts with the same designations that the interest, mine rent and miscellaneous expenses might be part of the expenditures here involved. This is not clear and since the total of those amounts is less than $325 out of total expenditures of over $588,000 it will be ignored.↩
4. Hogg testified that the joint venturers needed an operating company for the properties and the other stockholders of Strategic did not want to get into the mining business and so Oscura was set up to operate the properties. He stated that the mine was operated by Oscura as an operating agent for the partnership, that the employees were employed by Oscura and that the operating expenses of the mill and mine were handled through the operating agency, Oscura. Greer's only testimony with respect to the agreement between the partnership or joint venture and Oscura was in answering "yes" to a question of whether the purpose in organizing Oscura was for it to act as an agent or operating agent for the mining leases. He testified that the laborers were paid by Oscura and the supervisors employed by Oscura and that the corporate structure "gave us some protection from exposure to liability." An accountant who was employed by Greer and kept the books of United and Oscura and the partnership or joint venture under the general direction of Greer stated that on her understanding of the arrangement she considered the books of the various entities were correctly kept and stated her understanding to be that United and Oscura were operating on behalf of Portales Properties when they expended the funds for the operation of the mine, and that payments were made by Oscura in behalf of the joint venture. She also stated that payroll tax reports were filed under the name of Oscura, that the employees were paid from Oscura's bank account and she saw no reason why the employees working in New Mexico should know that Oscura was operating the property for a partnership.↩
5. See footnote 3 for analysis of these deposits.↩